STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2020 KA 1073

STATE OF LOUISIANA

VERSUS

SHANE CHRISTIAN PAGANO

Judgment Rendered: __OCT 0 4 2021__

*****

On Appeal from the
22nd Judicial District Court
Parish of St. Tammany, State of Louisiana
Trial Court No. 587254

The Honorable Raymond S. Childress, Judge Presiding

*****

| | |
|---|---|
| Rachel M. Yazbeck<br>New Orleans, Louisiana | Attorney for Defendant-Appellant,<br>Shane Christian Pagano |
| Shane C. Pagano<br>Angola, Louisiana | Defendant-Appellant,<br>In Proper Person |
| Warren L. Montgomery<br>District Attorney<br>Matthew Caplan<br>Assistant District Attorney<br>Covington, Louisiana | Attorneys for Appellee,<br>State of Louisiana |

*****

BEFORE: McDONALD, LANIER, AND WOLFE, JJ.

**WOLFE, J.**

The defendant, Shane Christian Pagano, was charged by grand jury indictment with aggravated/first degree rape (of a victim under the age of thirteen years), a violation of La. R.S. 14:42.[1] He pled not guilty and, following a jury trial, was unanimously found guilty as charged. The defendant was sentenced to imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant now appeals, designating three counseled assignments of error and three *pro se* assignments of error. For the following reasons, we affirm the conviction. Additionally, we amend the sentence by providing that the defendant be sentenced to life imprisonment and affirm as amended.

## FACTS

The defendant and Samantha[2] were married and lived in Slidell. They had four biological children between them. A fifth child, L.R.,[3] who also lived with them, was Samantha's biological daughter from another man. In December of 2016, the defendant was working in Atlanta. L.R., who turned thirteen years old on December 29, 2016, told her mother the defendant had been sexually abusing her. Samantha went to the police. Subsequently, Samantha took L.R. to Children's Hospital in New Orleans and to the Children's Advocacy Center for a forensic interview.

L.R. testified at trial about incidents in Slidell of anal sex with the defendant. She also testified that the defendant performed oral sex on her, and he forced her to perform oral sex on him. L.R. indicated that the sexual abuse lasted for ten or eleven

---

[1] Effective August 1, 2015, La. R.S. 14:42 was amended to redesignate aggravated rape as first degree rape. The time frame for the charges against the defendant was between August 1, 2009, and August 31, 2016.

[2] Samantha is the mother of the victim, L.R., and only her first name will be used throughout the opinion.

[3] Victims of sex offenses are referred to by their initials. See La. R.S. 46:1844(W).

2

years and stopped when she was twelve years old. According to L.R., the last sexual assault by the defendant was in the summer of 2016. The defendant testified at trial. He denied all allegations.

## COUNSELED AND *PRO SE* ASSIGNMENT OF ERROR NO. 1

In these first counseled and pro se assignments of error, the defendant argues the guilty verdict was not supported by sufficient evidence.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See La. Code Crim. P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See **State v. Patorno**, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.

At the time that the offense(s) began, La. R.S. 14:42 provided in pertinent part:

> A. Aggravated rape is a rape committed . . . where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
> * * * *
> (4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

3

Additionally, La. R.S. 14:41 provides:

A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.

B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.

C. For purposes of the Subpart, "oral sexual intercourse" means the intentional engaging in any of the following acts with another person:

(1) The touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender.

(2) The touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim.

The defendant asserts in brief that no testimony exists that anal penetration or oral sexual intercourse occurred. Specifically, the defendant suggests that L.R.'s nodding and shaking her head while testifying instead of saying "yes" or "no" leaves this court unable to review the sufficiency of the evidence because "[v]erbal answers are required in order for a complete review of the record." Further, the defendant asserts the State failed to rebut the hypothesis of innocence that the rape allegations were fabricated by L.R. and Samantha, because Samantha was upset that the defendant was seeing another woman named Amy. The defendant notes that he was always cheating on Samantha, but she always "looked the other way" because the defendant was financially providing for her and her children. The defendant began "diverting money" from Samantha to provide for Amy and Amy's children in Atlanta. Samantha told the defendant to end the relationship, but the defendant refused.

At trial, L.R. testified that the defendant's sexual abuse of her stopped when she was twelve years old. In describing the oral sexual intercourse between her and the defendant, fifteen-year-old L.R. testified as follows:

4

A. I remember he told me to go over there and he had pulled out his private part and told me to, like, kiss it.

Q. Just to make sure everybody is on the same page with you, what private part was it?

A. It was his penis.

\* \* \* \*

Q. So you mentioned it was his penis. What did he ask you to do with his penis?

A. He asked me to kiss it.

Q. Did you kiss it?

A. (Nodding head).

Q. Yeah. When you started to kiss it, did he do anything else with it?

A. That's really all I can remember.

Q. Do you remember if he put it in your mouth?

A. Oh, yeah, I remember that.

Q. Do you remember that? And I don't want to put words in your mouth. I just -- you know, do you remember that happening?

A. Yes, sir.

\* \* \* \*

Q. Let me ask you this: Your front private, okay, what do you call that?[4]

A. I call that my private.

Q. Did he ever do anything with your private? Your front private?

A. Uh-huh.

Q. What types of things would he do?

A. He would try to, like -- he would try to, like, kiss.

Q. Kiss it? Is that what you were saying? Please tell me if I'm wrong.

---

[4] The testimony prior to this involves acts committed by the defendant upon L.R. when they were living in Las Vegas. The testimony subsequent to this involves the defendant's sexual abuse of L.R. in Slidell.

A. You're right.

Q. He would try to kiss it. Would he do anything else with his mouth, on your front private, besides try to kiss it?

A. (Nodding head)

Q. What would he do?

A. I guess like lick.

Q. Would he lick -- where, on your front private, would he lick?

A. In my area.

\* \* \* \*

Q. . . . L.R., did anything ever come out of his private part?

A. (Nodding head)

Q. Okay. What came out of his private part?

A. I'm going to call that milky stuff.

Q. Where would -- it would come out of his private. And where would it go when it came out of his private?

A. Either on the napkin or in my mouth.

Q. So when it went in your mouth, did you taste it?

A. (Nodding head)

Q. How did it taste?

A. Sour.

The foregoing testimony by L.R., notwithstanding the defendant's incorrect claim that no testimony exists that oral sexual intercourse occurred, clearly established that she performed oral sex on the defendant, and the defendant performed oral sex on her. Either of these acts involved the aggravated rape of L.R. Moreover, head nods and head shakes constitute testimony. In **State v. Ashley**, 44,655 (La. App. 2nd Cir. 9/23/09), 22 So.3d 1045, 1059, writ denied, 2009-2305 (La. 4/23/10), 34 So.3d 271, the Second Circuit opined that nodding and shaking the head are "cross-cultural and widely accepted head gestures indicating agreement and

6

disagreement" and that such nonverbal responses constituted a part of the trial proceedings below.

In describing the anal intercourse, L.R. testified at trial as follows:

Q. In your area. Did he ever do anything -- what do you call your back private?

A. My butt.

Q. Your butt. Did he ever do anything with your butt?

A. (Nodding head)

* * * *

Q. What would he do with his private and your butt?

A. He would -- I don't want to say it. But he would just -- I'm going to say collide.

Q. Collide?

A. That's what I want to use. That's the term I want to use.

Q. Collide. So his private would collide with your butt?

A. (Nodding head)

Q. Yeah. L.R., did his private, when it collided, did it ever go into your butt?

A. (Nodding head)

In her CAC interview, L.R. described an incident involving anal intercourse. She said she was on the bed and the defendant took off her underwear. L.R. stated the defendant then "sticked his private part in my butt." L.R. cried because it hurt, and the defendant told her it would hurt for a few seconds.

Dr. Ellie Wetsman, a child abuse pediatrician at Children's Hospital in New Orleans, interviewed L.R. about the defendant's sexual abuse of her. On the cross-examination of Dr. Wetsman, the following exchange took place:

Q. Is it your understanding, and correct me if I'm wrong, that this young woman has indicated that she was the victim of repeated anal penetration; would that be fair?

7

A. I mean, she definitely gave me a history of anal penetration. I don't know if I could say repeated.

Q. But that a history of anal penetration of some fashion?

A. Yes.

The testimonial evidence clearly established the defendant raped L.R. through oral sexual intercourse and anal sexual intercourse. Regarding the defendant's assertion that Samantha was spurned and, accordingly, coached L.R. into fabricating the defendant's sexual abuse of her, the jury chose to believe L.R.'s account over the defendant's account of what transpired between L.R. and the defendant. That is, these arguments raised by the defendant concern credibility issues. The jury heard all of the testimony and chose to believe the account of L.R. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. **State v. Higgins**, 2003-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. **State v. Ford**, 2017-0471 (La. App. 1st Cir. 9/27/17), 232 So.3d 576, 586, writ denied, 2017-1901 (La. 4/22/19), 268 So.3d 295. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. **State v. Mitchell**, 99-3342 (La. 10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence that conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. **State v.**

**Nixon**, 2017-1582 (La. App. 1st Cir. 4/13/18), 250 So.3d 273, 291, writ denied, 2018-0770 (La. 11/14/18), 256 So.3d 290.

The testimony of the victim alone is sufficient to prove the elements of the offense. **State v. McKinney**, 2015-1503 (La. App. 1st Cir. 4/25/16), 194 So.3d 699, 705, writ denied, 2016-0992 (La. 5/12/17), 220 So.3d 747; **State v. Orgeron**, 512 So.2d 467, 469 (La. App. 1st Cir. 1987), writ denied, 519 So.2d 113 (La. 1988). When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Captville**, 448 So.2d 676, 680 (La. 1984). The jury's verdict reflected the reasonable conclusion that, based on the testimony of L.R., Samantha, and Dr. Wetsman, L.R. was raped by the defendant. In finding the defendant guilty, the jury clearly rejected the defendant's theory of innocence. See **Captville**, 448 So.2d at 680. See also **State v. Brooks**, 2017-1755 (La. App. 1st Cir. 9/24/18), 258 So.3d 944, 951, writ denied, 2018-1718 (La. 2/25/19), 266 So.3d 289, judgment vacated on other grounds, ___ U.S. ___, 140 S.Ct. 2712, 206 L.Ed.2d 849 (2020).

After a thorough review of the record, we find the evidence supports the jury's unanimous verdict. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the aggravated rape of L.R. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).

These counseled and *pro se* assignments of error are without merit.

### COUNSELED AND *PRO SE* ASSIGNMENT OF ERROR NO. 2

In these second counseled and *pro se* assignments of error, the defendant argues the trial court erred in failing to grant a mistrial when in its closing argument,

9

the State made an inappropriate and incorrect statement of the law. The complained of remark by one of the prosecutors in her closing argument is the following:

> Specifically, Louisiana Revised Statute 15:440 gives us a little bit of insight on how we are to weigh testimonial evidence. And that Statute specifically says that positive testimony on a given point must be given greater weight than negative testimony on the same point.
>
> Positive testimony on a given point must be given greater weight than negative testimony.
>
> What does that mean? That means [L.R.] getting up here and saying that [the defendant] raped her must be given greater weight than he getting up here saying –

At this point, one of the defense counsels objected that this was a mischaracterization of the law and pointed out to the trial court, correctly, that, "Someone saying something happened isn't given more weight just because they said it happened over someone saying it didn't happen." The trial court sustained the objection and noted that La. R.S. 15:440 was not included in its jury instructions.

After the prosecutor finished her closing argument, but prior to the defense closing argument, the other defense counsel moved for a mistrial, based on the prosecutor's misinterpretation of La. R.S. 15:440. Defense counsel pointed out that the State wrongly suggested to the jury that pursuant to La. R.S. 15:440, L.R.'s accusations against the defendant were to be given greater weight than the defendant's denial of those accusations. According to defense counsel, this mistake by the State so prejudiced the jury that a mistrial was warranted.

While the trial court found the prosecutor's discussion of La. R.S. 15:440 objectionable, it denied the motion for mistrial, finding that the error did not rise to the level of a mistrial. The trial court added that before giving the jury instructions, it would inform them that the trial court would provide the law governing deliberation, and not the argument of counsel in closing arguments.

Prior to defense counsel making his closing argument, the trial court addressed the jury as follows:

Before the Defense begins their closing argument, I just want to reiterate something that came up during the State's closing argument.

There was an objection as to the statement made by the State relative to testimony, positive testimony versus negative testimony. I sustained the objection.

The law that you will consider during your deliberation, I will give you the law for you to consider. In that, it will talk about argument of counsel is just that, argument. It's not evidence. If I don't say this is the law to be applied, if I don't include it in my instructions, you're not to consider it.

Making no objection to the trial court's admonition, defense counsel said, "Thank you, Judge."

In brief, the defendant cites to **State v. Ardoin**, 49 La. Ann. 1145, 1147, 22 So. 620, 621 (1897) (on rehearing), which noted that "while a merely inaccurate or incomplete instruction may be cured by subsequently supplying the defect or accurately stating the law, an absolute misstatement of the law is not cured by the correct statement elsewhere in the charge." The defendant's reliance on this case from 1897 is misplaced. In **Ardoin**, in its instructions to the jury, the trial court provided conflicting jury charges on the law governing the defense of alibi. That is, **Ardoin** concerned improper jury instructions given by the trial court, not closing arguments by the prosecutor. The applicable law, rather, in the instant matter, is that a "misstatement of the law by the prosecutor does not prejudice a defendant if the judge subsequently admonishes or correctly instructs the jury." **State v. Roy**, 95-0638 (La. 10/4/96), 681 So.2d 1230, 1239, cert. denied, 520 U.S. 1188, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997).

Louisiana Code Criminal Procedure article 770 governs mistrials on the basis of prejudicial remarks and provides:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;

(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

(3) The failure of the defendant to testify in his own defense; or

(4) The refusal of the judge to direct a verdict.

An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

The remark by the State did not fall under La. Code Crim. P. art. 770. Accordingly, the applicable law is La. Code Crim. P. art. 771, which provides in pertinent part:

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:

(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770[.]

A mistrial under the provisions of La. Code Crim. P. art. 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks make it impossible for the defendant to obtain a fair trial. See **State v. Flowers**, 2016-0130 (La. App. 1st Cir. 9/19/16), 204 So.3d 271, 284, writ denied, 2016-1871 (La. 9/6/17), 224 So.3d 983. A mistrial is warranted when certain remarks are considered so prejudicial and potentially damaging to the defendant's rights that even a jury admonition could not provide a cure. See **State v. Edwards**, 97-1797 (La. 7/2/99), 750 So.2d 893, 906, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999). Mistrial is a drastic remedy that is authorized only where substantial prejudice will otherwise result to the accused. **State v. Anderson**, 2000-1737 (La. App. 1st Cir. 3/28/01), 784 So.2d 666, 682, writ denied, 2001-1558 (La.

4/19/02), 813 So.2d 421. A trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion. **State v. Givens**, 99-3518 (La. 1/17/01), 776 So.2d 443, 454; **State v. Johnson**, 2006-1235 (La. App. 1st Cir. 12/28/06), 951 So.2d 294, 300.

Closing arguments in criminal cases should be restricted to the evidence admitted, to the lack of evidence, to conclusions of fact that may be drawn therefrom, and to the law applicable to the case. Further, the State's rebuttal shall be confined to answering the argument of the defendant. See La. Code Crim. P. art. 774. Prosecutors are allowed wide latitude in choosing closing argument tactics. See **State v. Draughn**, 2005-1825 (La. 1/17/07), 950 So.2d 583, 614, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). The trial judge has broad discretion in controlling the scope of closing arguments, and we will not reverse a conviction on the basis of improper closing argument unless thoroughly convinced that the remarks influenced the jury and contributed to the verdict. **State v. Vansant**, 2014-1705 (La. App. 1st Cir. 4/24/15), 170 So.3d 1059, 1063. See **State v. Prestridge**, 399 So.2d 564, 580 (La. 1981).

We find no reason to disturb the trial court's denial of the motion for mistrial. The trial court sustained defense counsel's objection, promptly addressed the misstatement of the law by the prosecutor, and admonished the jury that the law to be applied would be provided only by it, the trial court. Further, prior to opening statements and subsequent to closing arguments, the trial court instructed the jury to disregard matters to which an objection had been sustained.

In its jury instructions, the trial court provided the following pertinent jury charges: (1) "You may not consider evidence which you were instructed to disregard or to which an objection was sustained[;]" (2) "As the sole judges of the credibility of witnesses and the weight their testimony deserves, you should scrutinize carefully the testimony given and the circumstances under which the witness has testified[;]"

(3) "The opening statements and the closing arguments are not to be considered as evidence[;]" and (4) "If [the defendant testifies] he is governed by the same rules in testing his credibility and the correctness of his statements, as every other witness."

Much credit should be accorded to the good sense and fairmindedness of jurors who have seen the evidence and heard the argument, and have been instructed by the trial judge that arguments of counsel are not evidence. **Vansant**, 170 So.3d at 1065. See **State v. Mitchell**, 94-2078 (La. 5/21/96), 674 So.2d 250, 258, cert. denied, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996). The prosecutor's remarks about La. R.S. 15:440 did not contribute to the verdict nor make it impossible for the defendant to obtain a fair trial. See La. Code Crim. P. art. 775; **Vansant**, 170 So.3d at 1064.

Based on the foregoing, we find no abuse of discretion in the trial court's denial of the defendant's motion for a mistrial. Accordingly, these counseled and *pro se* assignments of error are without merit.

## COUNSELED ASSIGNMENT OF ERROR NO. 3

In his third counseled assignment of error, the defendant argues the State, through the St. Tammany Parish Sheriff's Office, engaged in witness intimidation[5] while the trial was in progress. Specifically, the defendant contends the lead detective on the case called a defense witness's employer to report his testimony, and that this was a violation of the defendant's due process rights.

Detective Carli Messina, with the St. Tammany Parish Sheriff's Office and the lead detective on L.R.'s case, testified at trial in the State's case-in-chief. Officer Steven Roshto, with the New Orleans Police Department, testified as a character witness in the defendant's case-in-chief.

---

[5] While the defendant uses the word "intimidation" in the heading of this assignment of error, he actually cites to La. R.S. 14:129.1 and argues it was witness tampering throughout the entire argument.

During jury deliberations, a defense counsel learned that Detective Messina had contacted Officer Roshto's superiors and told them "something along the lines of Mr. Roshto came up here and testified, in an official capacity, for a convicted rapist." Defense counsel stated that he wanted a minute entry to reflect that Officer Roshto testified not in an official capacity, but as a fact witness, and suggested that a witness, on behalf of the State, contacting the employer of a defense witness, suggested "a very chilling effect on the wheels of justice."

One of the prosecutors responded as follows:

I did speak to Detective Messina earlier.

She indicated that she was sitting in during the testimony of Officer Roshto. She noticed that he was wearing his badge and I think other identifying credentials or whatever.

My understanding is that is upon seeing that, she notified her superiors or supervisors. They talked about it.

I don't know if there was a consensus or if she did it on her own, but she reached out to NOPD to let them know that he had testified -- not that he had testified for [t]he defense, but that he had testified with his badge and was representing NOPD.

What I want to make clear, and I told [defense counsel] this earlier, nobody from the DA's office had anything to do with encouraging her or telling her to do any of this.

The trial court agreed with defense counsel regarding the minute entry, but noted that when Officer Roshto "first walked in I think he even had an empty holster on him, and he had his badge on, and my first thought was who is this guy? What is he doing here?" The trial court continued, "So, whatever they do – 'they' being NOPD – does to discipline him is between him and them."

Post-trial, the defendant filed a motion for new trial and accompanying "Motion To Determine The Extent Of Detective Messina's Witness Tampering." At the motion for new trial hearing, Detective Messina testified that she was not present for Officer Roshto's testimony. Detective Messina observed Officer Roshto exit the courtroom and give the defendant a hug in the hallway outside. The detective

15

noticed Officer Roshto was in plain clothes, but wearing a police officer badge on his waistband. Detective Messina asked one of the trial prosecutors who Officer Roshto was and learned that he worked for the NOPD, and that he testified as a character witness on behalf of the defendant. The detective then contacted the NOPD's Public Integrity Bureau to report that an NOPD officer had testified on behalf of a defendant while wearing his badge. Detective Messina explained:

> [W]hen you're wearing the badge, you're representing the agency. If I were to go to New Orleans and the court systems there and if I were to wear my badge and testify on behalf of a friend of mine and who was a drug dealer.
>
> And I had absolutely nothing to do with the investigation, whatsoever, that's an obvious violation. It shows that I'm trying to use my badge and my position as an officer to sway [t]he Jury.
>
> I would not have had a job before I even got back across the Causeway.

Detective Messina testified she made the call to NOPD while the trial was still in progress. She made it clear, however, that she never spoke to Officer Roshto, and that any reporting she made about Officer Roshto was after he had already testified. She further indicated that no one from the District Attorney's Office asked her to reach out to anyone, and that she was obligated to report an obvious policy violation. Detective Messina also testified that she did not tell NOPD that Officer Roshto was testifying on behalf of a convicted rapist; rather she stated he was testifying on behalf of a defendant on trial for raping a child.

In denying the motion for new trial, the trial court found in pertinent part:

> I've had an opportunity to review the filings, on behalf of the defendant, and we have an abundance of caution, at the hearing here today where Detective Messina could clarify for all concerned, precisely what actions she took. And more importantly, when they were taken.
>
> She contacted NOPD after Officer Roshto had testified. I don't think -- she said that she never met Officer Roshto. She saw him out in the hall.

She wasn't here for his testimony. And well after he had completed his testimony, she contacted NOPD.

I don't think, in any way, any interpretation, any manifestation that you want to come up with, that you can say that impeded the defense case.

\* \* \* \*

I see no merit in that argument, at all. She did what she thought was right, after Officer Roshto testified. And between him and NOPD, that's up to them. He's an officer there. He should be aware of whatever their rules are, relative to things such as this. And he should abide by those, as we would expect Detective Messina to abide by the rules where she works and all of us to abide by whatever rules are appropriate for us.

So that having been said, I find no merit in that argument.

We adopt in full the findings of the trial court regarding the defendant's claim of witness tampering. Detective Messina's having never met Officer Roshto, coupled with the indispensable fact that any reporting she made to NOPD or Officer Roshto's superiors was *after* Officer Roshto had completed his testimony and left the courtroom, clearly established the lack of any witness tampering. The defendant's due process rights were not violated, and Detective Messina's decision to contact NOPD for what she perceived to be a policy violation had no effect whatsoever on the outcome of the defendant's trial.

This counseled assignment of error is without merit.

### *PRO SE* ASSIGNMENT OF ERROR NO. 3

In his third *pro se* assignment of error, the defendant argues the trial court erred in overruling his objections to the State's expert witness testimony. Dr. Wetsman, as discussed in the first assignment of error, interviewed L.R. at Children's Hospital about the defendant's sexual abuse of her. The defendant contends that Dr. Wetsman's testimony on delayed disclosure and grooming[6] were

---

[6] The defendant objected only to the issue of delayed disclosure. Therefore, the defendant's challenge to Dr. Wetsman's testimony on grooming is not before us. See La. Code Crim. P. art. 841(A).

not within her field of expertise, namely because the doctor had no training in the field of psychology.

Dr. Wetsman was accepted as an expert in general pediatrics and child abuse pediatrics. She is one of about 300 to 400 doctors in the United States that is certified by the Board of Pediatrics for child abuse. Dr. Wetsman is also a professor at LSU Medical School and Tulane Medical School. She is part of the American Academy of Pediatrics and the American Professional Society on the Abuse of Children. She had a publication in the Children's Hospital newsletter for pediatricians to help them with evaluating children who may have been physically or sexually abused. She had also qualified as an expert before.

Just as Dr. Wetsman began to discuss delayed disclosure, or why children sometimes do not tell of their abuse right away, the defendant objected, arguing Dr. Wetsman did not have a background in psychology. The trial court informed the prosecutor to lay a better foundation. Dr. Wetsman thus explained that she had researched child sex abuse cases from around the world. She further indicated that her testimony was not about L.R. per se, but in general, why people do not disclose. The defendant objected, arguing that a foundation had not been laid. The trial court overruled the objection.

Expert testimony can assist a jury in understanding the significance of a child-witness's demeanor, inconsistent reports, delayed disclosure, reluctance to testify, and recantation. **State v. Chauvin**, 2002-1188 (La. 5/20/03), 846 So.2d 697, 702. See **State v. Foret**, 628 So.2d 1116, 1130 (La. 1993). An expert witness can explain to the jury that a child-witness's seemingly abnormal behavior such as delayed reporting, inconsistent statements, and recantation is normal for children who have been sexually abused and can also dispel jurors' inaccurate perceptions allowing them to better assess a child-witness's testimony. **Chauvin**, 846 So.2d at 703.

Dr. Wetsman's background and education established that she was competent as an expert witness to discuss delayed disclosure. Despite the defendant's assertion, there is no prerequisite that an expert witness have a background in psychology to propound expert opinion about the general characteristics that would explain a delay in reporting sexual abuse. See **State v. Hampton**, 2013-0580 (La. App. 4th Cir. 2/19/14), 136 So.3d 240, 245-48. See also **State v. Grandison**, 2018-0046 (La. App. 1st Cir. 11/5/18), 2018 WL 5785333, *5 (unpublished), writ denied, 2018-1992 (La. 6/3/19), 272 So.3d 545 (Dr. Jamie Jackson, a child abuse pediatric attendant at Children's Hospital was accepted at trial as an expert in the field of child abuse pediatrics and testified about delayed disclosure); **State v. McClendon**, 2017-0160 (La. App. 4th Cir. 9/27/17), 228 So.3d 252, 257, writ denied, 2017-1836 (La. 6/1/18), 243 So.3d 571 (a nurse practitioner testified about delayed disclosure); **State v. Lewis**, 50,546 (La. App. 2d Cir. 5/4/16), 195 So.3d 495, 497-98, writ denied, 2016-1052 (La. 5/1/17), 219 So.3d 330 (an expert sexual assault nurse examiner testified about delayed disclosure). Accordingly, we find the trial court did not err in allowing Dr. Wetsman to testify about delayed disclosure.

The defendant also takes issue in brief with "consistent with" sexual abuse testimony. While the defendant points to nothing specifically in the trial record regarding this, we note that Dr. Wetsman testified on direct examination that what she had been told was consistent with abuse. Dr. Wetsman also indicated on direct examination that a normal physical examination such as L.R.'s was consistent with her having disclosed months after the alleged last assault.

There were no objections made to Dr. Wetsman's testimony. Accordingly, this issue is not preserved for review. See La. Code Crim. P. art. 841(A). Moreover, "consistent with" testimony is permissible at trials regarding sexual abuse claims. See **State v. Griffin**, 2015-1765 (La. App. 1st Cir. 4/27/16), 2016 WL 2840309, *3-4 (unpublished).

This *pro se* assignment of error is without merit.

## SENTENCING ISSUE

Under La. Code Crim. P. art. 920(2), we are limited in our review to errors discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence. After a careful review of the record, we have found a sentencing error.

For a conviction of aggravated (first degree) rape, the offender *shall* be imprisoned at hard labor for life without benefit of parole, probation, or suspension of sentence. La. R.S. 14:42(D)(1). According to the sentencing transcript, the trial court failed to provide that the sentence for the defendant's conviction was life imprisonment.[7] Louisiana Code of Criminal Procedure article 920(2) authorizes consideration of such an error on appeal. Further, La. Code Crim. P. art. 882(A) authorizes correction by the appellate court.

We find that correction of the sentence does not involve the exercise of sentencing discretion and, as such, there is no reason why this court should not simply amend the sentence. Accordingly, since a sentence of life imprisonment without the benefit of parole, probation, or suspension of sentence is the only sentence that could be imposed, we correct the sentence by providing that the defendant be sentenced to life imprisonment. We also remand to the trial court for correction of the commitment order, if necessary, and for transmission of the amended record to the Department of Corrections.

**CONVICTION AFFIRMED; SENTENCE AMENDED TO PROVIDE THAT THE DEFENDANT BE SENTENCED TO LIFE IMPRISONMENT WITHOUT THE BENEFIT OF PAROLE, PROBATION, OR SUSPENSION OF SENTENCE AND AFFIRM AS AMENDED; REMAND FOR CORRECTION OF THE COMMITMENT ORDER, IF NECESSARY, AND FOR TRANSMISSION OF THE AMENDED RECORD TO THE DEPARTMENT OF CORRECTIONS.**

---

[7] The minute entry indicates the defendant was sentenced to life imprisonment. When there is a discrepancy between the minutes and the transcript, the transcript must prevail. **State v. Lynch,** 441 So.2d 732, 734 (La. 1983).